Ms. Cathie Matthews, Director Department of Arkansas Heritage 323 East Center Street, Suite 1500 Little Rock, Arkansas 72201
Dear Ms. Matthews:
I am writing in response to your request for an opinion on three questions concerning the relationship of the Department of Arkansas Heritage — Arkansas Territorial Capitol Restoration Commission ("Commission")[1] to the Arkansas Territorial Restoration Foundation, Inc. ("Foundation"). Specifically, you note that the findings of a recent audit performed by the Division of Legislative Audit are critical of the Commission's relationship with the Foundation. You have enclosed the proposed audit finding for my review and ask that I incorporate it with your request for the purpose of my opinion. The "Findings and Recommendations" of the auditors include the following:
 Commission personnel, equipment and facilities are used to generate Foundation revenues and support Foundation activities.
 The Commission was created and charged with the duty of restoring the old Territorial Capitol and other historic buildings and to secure any additional funds in defraying the cost of restoration. Additionally, enabling legislation provides that funds realized from the sale of souvenirs and from other sources connected with the project shall be used for the maintenance of the historic center. The Commission may be circumventing legislation by directing substantially all donations and grants to the Foundation. For the year ended June 30, 2000 the Commission received $142 in contributions and grants. For the year ended December 31, 2001 the foundation received $127,328 in contributions and grants. In addition, the Commission has contracted with the Foundation for the sale of souvenirs. For the year ended December 31, 2000 the foundation collected $13,430 form museum store sales.
 The Foundation utilizes Commission trademarks and website for advertising membership in the Foundation. Furthermore, Foundation records are maintained with Commission equipment and six (6) State personnel are used for various duties without reimbursement. The Executive Director and the Chairperson of the Commission are ex-officio members of the Foundation Board of Directors. The Commission and Foundation may appear to be virtually the same entity to the public.
The auditors question the legality of the relationship of the Commission and the Foundation in light of an opinion issued by my predecessor, Op. Att'y Gen. 98-288, in which Attorney General Winston Bryant concluded that in all likelihood the Arkansas Waterways Commission could not lawfully house records for, or accept or send telephone, fax or electronic messages on behalf of the Arkansas Waterways Association, a private nonprofit entity.
You place emphasis on the fact that one of the Commission's purposes is to "secure additional funds . . . for the project . . . form private subscriptions to assist in defraying the cost of restoration. . . ." A.C.A. § 13-7-302(a)(5). You also state that in return for the services provided by the Commission, the Foundation provides the Commission with benefits that exceed the value of the Commission's assistance. You then detail a number of Foundation expenditures for fiscal year 2000 on behalf of the Commission, including $15,385.56 in donations to the museum's collection of artifacts; $37,225.59 for furniture for the museum's new library; $21,017.89 for the Living History Program; and $1,237.66 toward the purchase of library books. In addition, you note that $78,100 was expended to pay a construction company for expansion of the museum.
You pose the following three questions:
 1. Can the Commission maintain its current relationship with the Foundation, given that this relationship furthers a public purpose by providing funds and other benefits to the Commission which are used to operate the museum?
 2. Is your answer to the first question affected by the value of the benefits from the Foundation to the Commission? To state this question another way, does the constitutionality of this relationship depend on the value of the benefits from the Foundation equaling or exceeding the value of the assistance from the Commission?
 3. Would your answer to the first question be affect if the Commission and Foundation entered into annual agreements that specified the obligations and benefits from each organization to the other?
RESPONSE
There is sparse legal authority on the questions you pose. In addition, what little authority I have found on the topic indicates that each such relationship must be evaluated on its own particular facts. Although you have provided me with certain facts for purposes of this opinion, I cannot, through the issuance of an Attorney General's opinion, conclusively determine such a fact-intensive inquiry. I can, however, outline the applicable law that will be relevant in assessing the pertinent facts. I have attempted to do so below, although there is apparently a variation of opinion on the issue and the applicable limitations attendant such relationships. I can only state, in response to your first question, that the Arkansas Supreme Court has never addressed the constitutionality of an arrangement such as you describe. Reliably predicting what that court would hold on the question is therefore impossible. It is entirely possible that our court would eschew the sharing of public assets with private entities in this manner. My review of the only available authorities, however, indicates that the legality of the relationship may depend upon how it is structured. The current structure of the relationship between the Commission and the Foundation, based upon the facts you have relayed, may be deficient in some respects. In response to your second question, assuming such relationships can be lawful, a mathematical quid-pro-quo is not required, although in most cases some form of consideration may be. In response to your third question, a written agreement is advisable. Due to the fact-intensive nature of such issues, however, agencies such as the Territorial Capitol Restoration Commission must rely on the advice of their appointed counsel in assessing the facts of their particular relationships and in structuring those relationships to comport with law.
Question 1 — Can the Commission maintain its current relationship withthe Foundation, given that this relationship furthers a public purpose byproviding funds and other benefits to the Commission which are used tooperate the museum?
I assume by this question that you mean to inquire about the legality and or constitutionality of the Commission's current relationship with the Foundation. You have not defined the "current relationship" in detail, but have included the audit findings in this regard. I assume, at a minimum, therefore, that the relationship to which you refer includes the sharing of Commission personnel (without reimbursement), equipment (including records maintenance) and facilities with the Foundation; the "directing" of donations and grants to the Foundation by the Commission; the contract between the Commission and the Foundation with reference to selling souvenirs at the museum; use of the Commission's website for Foundation advertising; and the service of the Director and Chairperson of the Commission as ex-officio members of the Foundation's Board of Directors.
Applicable Law
At least two statutes are relevant to your questions. They relate to the powers and duties of the Commission and provide as follows:
A.C.A. § 13-7-305
 (a) Before and after the restoration work on the historic center is completed, the Arkansas Territorial Capitol Restoration Commission may charge an admission fee thereto as it deems appropriate.
 (b) The funds realized form admission fees, the sale of souvenirs, and from other sources connected with the project shall be used for the maintenance of the historic center so far as necessary.
 (c) Any surplus funds from these sources of income that may be in the hands of the commission at the end of each fiscal year shall be deemed cash funds.
 A.C.A. § 13-7-307
 The Arkansas Territorial Capitol Restoration Commission is authorized to accept and receive any and all gifts, grants, donations, and contributions of real and personal property and to manage and use the property and the income therefrom for the construction, reconstruction, restoration, and maintenance of buildings or facilities and for other improvements on Block 32 of the Original City of Little Rock, the Territorial Capitol Restoration Grounds.
In addition to the statutes above, there are several constitutional provisions of potential applicability to your inquiry, including Arkansas Constitution, art. 12, §§ 2, 5 and 12, and art. 16, § 1. In my opinion, however, these express provisions of the Arkansas Constitution are in various ways inapplicable to the facts you recite.[2] The most important constitutional doctrine for purposes of analyzing your questions is an implicit one — the so-called "public purpose doctrine." The doctrine is a constitutional common law doctrine. It was discussed inChandler v. Board of Trustees, 236 Ark. 256, 365 S.W.2d 447 (1963) as follows:
 No principle of constitutional law is more fundamental or more firmly established than the rule that the State cannot, within the limits of due process, appropriate public funds to a private purpose. A century ago the basic doctrine was simply stated in the leading case of Brodhead v. City of Milwaukee, 19 Wis. 624: "The legislature cannot create a public debt, or levy a tax, or authorize a municipal corporation to do so, in order to raise funds for a mere private purpose. It cannot in the form of a tax take the money of the citizens and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well being of the community required to contribute."
Chandler, 236 Ark. at 258 quoting Brodhead v. City of Milwaukee,19 Wis. 624. See also generally, Rubin, Constitutional Aid LimitationProvisions and the Public Purpose Doctrine, 12 St. Louis U. Pub.L. Rev. 143 (1993).
In Chandler, the Arkansas Supreme Court struck down statutes authorizing participation of the employees of the Arkansas Education Association in the Arkansas Teachers' Retirement System. The court conceded that some of the Association's activities furthered the cause of public education within the state. Id. at 259. On the other hand, the court noted, the Association's by-laws provided for a standing Legislative Committee and the members engaged in lobbying activities. In addition, the court noted that a "retirement allowance represents compensation paid to the recipient," and although the cause of public education was furthered by the activities of the AEA employees, there was no indication that they devoted their time to the public service. Id. at 259, 260.
Arkansas cases interpreting whether state expenditures benefiting private entities violate the public purpose doctrine are scarce. Chandler is the only apposite Arkansas case involving the state and a private association.[3] In addition, the Arkansas Supreme Court has declined to give a judicial definition to the phrase "public purpose" because "its meaning is not exact, nor is it prone to a static definition." City ofNorth Little Rock v. Pulaski County, 332 Ark. 578, 968 S.W.2d 582
(1998). As stated by my predecessor, however, with regard to the public purpose test, "[a] primary factor in determining whether public funds are being used impermissibly appears to be whether those who contributed tax money received the intended benefit therefrom, or whether, by contrast, the benefit was received by a private individual or entity. . . . A determination of the question of who is receiving the primary benefit of the property will turn upon a consideration of all of the relevant facts. . . ." Op. Att'y Gen. 98-191 at 4. It has also been stated that "[t]he determination of whether a particular expenditure is for a "public purpose" is to be made by the legislature. Although ultimately the propriety of a particular expenditure is resolved by the judiciary, great weight must be given legislative declarations of public purposes." Op. Att'y Gen. 91-410 at 4, citing Turner v. Woodruff, 286 Ark. 66,698 S.W.2d 527 (1985).
After extensive research, I have found only one reported judicial decision in this country on the legality of a relationship similar to the one you describe. In Slawson v. Alabama Forestry Commission,631 So.2d 953 (Ala. 1994), suit was brought against the Forestry Commission challenging its support of a private nonprofit organization named the "Stewards of Family Farms, Ranches and Forests." The agreed facts indicated that the "Commission has used its resources, including the services of state personnel and equipment, to organize, promote, and support various nonprofit organizations or `cooperators' whose goals or objectives . . . are consistent with the overall objectives of the Forestry Commission." Id. at 954-955. The purposes of "Stewards," as indicated in its by-laws, was to "promote stewardship among private landowners, to protect these landowners' private property rights by `confronting environmental and political extremism in the public and/or political arena,' and to develop and implement `a national strategy designed to confront actions which threaten private property rights of family farm, ranch, and forest owners.'" Id. at 954-955. The Alabama Supreme Court held that the applicable constitutional restrictions (similar to art. 12, § 5 and 16, § 1 of the Arkansas Constitution) were not transgressed as long as the expenditures served a "public purpose," which the court defined as having "for its objective the promotion of public health, safety, morals, security, prosperity, contentment, and the general welfare of the community. [Citation omitted.] The paramount test should be whether the expenditure confers a direct public benefit of a reasonably general character, that is to say, to a significant part of the public, as distinguished from a remote and theoretical benefit . . . The trend among the modern courts is to give the term `public purpose' a broad expansive definition." Id. at 956, citing Opinion of the Justices
No. 269, 384 So.2d 1051 (Ala. 1980). The trial court had given deference to the Commission's determination that the Stewards' goals were compatible with the Commission's. The Supreme Court could not say that the trial court erred in that judgment.
Although this is the only judicial decision I have found similar to the facts you present, a number of other Attorneys General, including my predecessor, have had the opportunity to opine on similar facts. At least one Attorney General has distinguished the Slawson decision as applying a much more liberal test for a "public purpose" than applicable in his state. In Idaho Opinion of the Attorney General 95-7 (1995 WL 646503), the Idaho Attorney General was asked to opine upon the applicable limitations on loaning and/or sharing State of Idaho employees or facilities to or with private foundations. In a summary of the conclusion reached, the Idaho Attorney General stated that:
 State of Idaho employees or facilities may not be shared with or loaned to private charitable foundations unless such action serves a public purpose and is directly related to a function of government. Moreover, such arrangements will be most likely to withstand a judicial challenge if the foundation involved exists for the benefit of the state agency and performs activities which the state agency can conduct. Additionally, there should be state control, whether contractual or otherwise, to ensure that the activities of the charitable foundation continue to meet the public purpose requirement.
Id. at 1.
The Idaho AG stated that "there is authority concluding that these arrangements can meet the public purpose requirement." He then cites Attorney General opinions from Texas and Utah as authority but distinguishes the Slawson decision as applying a broader "public purpose" definition than employed by the Idaho courts. He also stated that:
 [I]t is clear that there is some variation in terms of how the public purpose doctrine is applied when a state provides resources or personnel to a private organization. The Alabama Supreme Court appeared to take a significantly looser approach than did either the Texas or the Utah Attorneys General and to defer significantly to the executive agency's decision. Because of this variation and the limited number of cases available to review, it is difficult to state with absolute certainty what the limitations on facility and personnel sharing are.
Id. at 7.
The Idaho Attorney General went on, however, to make a number of suggestions as to the structuring of the arrangements, including that: "the arrangement must benefit the community, and it must be directly related to the function of government. Moreover, it would be desirable that the foundations' sole or principle purpose is to support the state agency, and the foundation only engages in activities which the state agency is specifically authorized to conduct. Finally, any sharing arrangement affecting personnel or other state resources should be memorialized in writing, and the state should retain some control over the foundation to ensure that the public purpose justifying the sharing arrangement continues to be served." Id. at 7.
Other Attorneys General have stressed similar considerations in addressing analogous issues. See, e.g., La. Op. Att'y Gen. 98-346 (1998 WL 781131) (cooperative endeavor agreement between Department of Wildlife and Fisheries and Louisiana Wildlife and Fisheries Foundations, which entailed sharing of personnel time, office space, goods and services was not an unconstitutional "donation" because the purpose of the Foundations was solely to benefit the Department); Texas Op. Att'y Gen. MW-373 (1981 WL 140058) (relationship between the University of Texas and the University of Texas Law School Foundation not unconstitutional where Foundation existed to serve the educational function of the law school, its charter required it to devote its resources to benefiting the law school, its charter required it to devote its resources to benefiting the law school, and where adequate controls exist to ensure the public purpose is met, but University could not pay Foundation's employees' benefits); Oklahoma Op. Att'y Gen. 82-71 (Oklahoma Wheat Commission could not lawfully provide office space and secretarial and bookkeeping services for the Oklahoma Wheat Growers Association, at least absent a contract where proper governmental controls and safeguards exist to ensure the accomplishment of a public purpose); and North Dakota Op. Att'y Gen. L-62 (2000 WL 33156050) (implied verbal agreement between University and related nonprofit alumni association or foundation, under which foundation receives unreimbursed office space, utilities, telephone, janitorial, payroll or accounting services were not unlawful because they represented an "exchange for value" and the sole function of the foundation was to provide financial assistance to the university, but recommending written operating agreements).
The most relevant Arkansas Attorney General opinion is Op. Att'y Gen.98-288, in which my predecessor concluded that the private Arkansas Waterways Association's use of the Arkansas Waterways Commission's public facilities, phone lines, fax machines and computers gave rise to constitutional concerns and was in all likelihood unlawful. It was stated that "[s]uch an arrangement implicates the private use of public facilities, and thus the `public purpose' doctrine, and the `illegal exaction' provision of the Arkansas Constitution."[4] Id. at 4. No discussion or mention was made, however, in either the request or the Opinion, of a contract supporting the use of these services or in fact whether any public benefit flowed to the State from the activities of the private Association. The balance of the opinion responded to questions concerning the provision of a lobbyist to the Commission by the Association and whether the Commission employees could receive payment for services rendered to the Association.
Application of the Law to the Facts
In my opinion the statutes cited previously (A.C.A. §§ 13-7-305 and -307), as well as the public purpose doctrine (as interpreted by the various authorities) are relevant in analyzing two aspects of the relationship between the Commission and the Foundation: 1) the "contract" regarding the sale of souvenirs at the museum and 2) the directing of donations to the Foundation. The other aspects of the relationship must be analyzed under the "public purpose doctrine" and any other applicable law.
Section 13-7-305(b) of the Arkansas Code, quoted earlier, requires funds realized from the sale of souvenirs and "from other sources connected with the project" to be used for the maintenance of the historic center. Subsection (d) of the same statute states that any surplus funds from these sources shall be deemed "cash funds." These provisions, taken together, seem to contemplate that the funds received from the sale of souvenirs will remain in the hands of the State, as opposed to a private foundation. The term "cash funds," is a designation applicable to certain income of state agencies. See, e.g., A.C.A. § 19-4-801, as amended by Act 1453 of 2001 and Gipson v. Ingram, 215 Ark. 812, 223 S.W.2d 595 (1949).
The audit findings state that the "Commission has contracted with the Foundation for the sale of souvenirs." I have not been provided with a copy of any such contract, and thus cannot definitively analyze its legality. I assume from the findings of the auditors that the Foundation is receiving the income under the contract from the sale of souvenirs. The findings state that "[f]or year ended December 31, 2000 the Foundation collected $13,430 from museum store sales." A question arises, therefore, as to whether the contract is contrary to law. Again, I cannot conclusively determine the issue without reference to the contract. It may well be that funds are ultimately spent for the intended purposes, i.e., for "maintenance of the historic center." The designation of surplus funds, however, if any, as "cash funds," indicates that perhaps privatization of this function would require legislative sanction.
An analysis of the public purpose of the contract would require detailed reference to its provisions, including the purposes for which the Foundation could expend the funds and the existence of any adequate controls on their expenditure.
As for the directing of donations and grants to the Foundation, again, I cannot conclusively determine the statutory issue absent reference to all the facts. The relevant statute, A.C.A. § 13-7-307, authorizes the Commission to accept gifts, grants and donations, and to use the funds for maintenance of the buildings and facilities and for other improvements on the property in question. It does not state that it is the only entity authorized to accept contributions made on behalf of these purposes.
The finding of the auditors states merely that: "The Commission may be circumventing legislation by directing substantially all donations and grants to the Foundation." It is not indicated whether the Commission is simply informing potential donors to conduct their business with the Foundation, or whether in fact funds accepted by the Commission are being forwarded by it to the Foundation. The latter case would appear markedly more problematic under A.C.A. § 13-7-307 and the public purpose doctrine. See, e.g., Texas Att'y Gen. Op. H-1309 (1978) (WL 24565) and La. Op. Att'y Gen. 92-657 (1993 WL 185107).
As for the sharing of Commission equipment, facilities and website, the legality of the current relationship turns upon its "public purpose." Again, this will depend upon all the relevant facts. It appears from the information you have provided that the Foundation has expended substantial sums benefiting the programs of the Territorial Restoration. Obviously, there is some public benefit at play in the activities of the Foundation. The question of the legality of the relationship, however, may depend upon the totality of the relationship and how it is structured to ensure the fulfillment of a public purpose.
One of the factors emphasized by the Attorney General opinions cited above is whether the sole purpose of the foundation is to support the state agency. In this regard, the Articles of Incorporation of the Arkansas Territorial Restoration Foundation list its purposes in relevant part as follows:
 (a) To receive and administer funds for charitable, scientific, literary and educational purposes and to that end to take and hold . . . property . . . to sell . . . or otherwise dispose of any such property and to invest . . . the income thereof in such manner as, in the judgment of the directors, will best promote the purposes of the Corporation. . . .
 (b) Without limiting the generality of the foregoing, one of the principal purposes of the Corporation shall be the fostering of educational opportunities for the public at the Arkansas Territorial Restoration through a museum, museum store, exhibitions, lectures, forums, or other similar activities or programs.
Articles of Incorporation of the Arkansas Territorial Restoration Foundation, Article Three, (a) and (b).
Thus, although "one of the principal purposes" of the Foundation is to foster development of programs connected to the Territorial Restoration, this is not stated as the sole or even the primary purpose of the Foundation.[5]
Another factor is whether the state agency retains some controls over the actions of the private foundation. The idea behind this requirement is that a public purpose cannot be assured through use of state provided resources, unless the state retains some type of enforceable ability to direct the use of the resources provided. Oklahoma Op. Att'y Gen. 82-71,supra. Although most of the authorities indicate that this control should be exercised through a contract, there is authority for the proposition that it can be provided by having the Foundation's "sole purpose" be to assist the state agency, or through other regulatory mechanisms. See,e.g., Texas Op. Att'y Gen. MW-373 (1981 WL 140058).
An additional and related factor emphasized by the available precedent is whether the relationship or arrangement is memorialized in writing. Although the auditors' report indicates an existing contract between the Commission and the Foundation with regard to the sale of souvenirs at the museum, no general contract governing the use of Commission facilities and equipment by Foundation members is mentioned. It is unclear, therefore, to what extent the Commission has the ability to legally enforce the purposes to which the Foundation applies the use of facilities, equipment, etc., provided by the Commission.
The absence of some or all of these factors in the relationship between the Commission and the Foundation suggest a need for a more carefully structured arrangement in order to render it judicially defensible. Again, the available law on the issue is sparse and I cannot state with certainty whether any particular arrangement will pass constitutional muster. The issues addressed herein should be reviewed by counsel for the Commission and other agencies facing similar issues, in order to ensure compliance with law.
I must emphasize a special point of concern, however, with regard to the sharing of Commission "personnel." This issue was touched upon in Op. Att'y Gen. 98-288, issued by my predecessor. At issue in that Opinion, among other things, was whether Arkansas Waterways Commission employees (state employees) could perform contract labor for, serve as staff for, or receive payment from the Arkansas Waterways Association (a private entity). My predecessor cited A.C.A. § 21-8-801, which prohibits public servants from receiving compensation, other than their state salary and benefits, for the performance of the duties of their state positions. Also relevant is A.C.A. § 21-8-304, which prohibits state employees from using their official positions to secure special privileges not available to others. Please be aware, therefore, that special limitations and considerations may attend the sharing of state personnel in this regard absent specific statutory authority to the contrary.
One final aspect of the relationship must be addressed. The auditors state that the Executive Director and the Chairperson of the Commission are ex-officio members of the Foundation Board of Directors. Although this set of facts might appear to further the retention of control over the private entity's activities (as suggested above), it may lead to other problems. The Texas Attorney General addressed this issue in Texas Op. Att'y Gen. H-1309 (1978 WL 24565). He raised an ethical problem with the dual service in the event a contract between the two entities was executed. In essence, he concluded, state agency directors would be prohibited from contracting with a private entity in which they also have an interest. The rule is the same in Arkansas, which holds such contracts "voidable," at least where the officer has a pecuniary interest. See,e.g., Warren v. Reed, 231 Ark. 714, 718, 331 S.W.2d 847 (1960) ("A public officer cannot lawfully make a contract either with himself, or with himself as agent for others" and the rule applies even where the contract was entered into honestly, in good faith and even if the officer in fact subordinated his private interests to his public duty.) The various state jurisdictions are not in complete accord as to whether a pecuniary interest must attend the finding of a prohibited conflict. See, e.g., 67 C.J.S. Officers § 204(a). I have found no Arkansas cases squarely on point. Cf. however, Thompson v. Roberts, 333 Ark. 544, 970 S.W.2d 239
(1998) (describing the common law prohibition in very broad terms); andTruitt v. Board of Public Works, 243 Md. 395, 221 A.2d 370 (1966) (vote of State Treasurer who sat on Board of Public Works and also as nonprofit hospital board member, to grant loan to hospital did not violate any legal prohibition, but suggesting that in the future board members "may prefer not to participate in decisions involving institutions on whose board they serve"). It appears, therefore, that the dual service of the officials in question may be problematic to the extent the two entities engage in the advisable course of detailing their relationship in a contract. I cannot state, however, that the dual service is contrary to controlling Arkansas law.
Question 2 — Is your answer to the first question affected by the valueof the benefits from the Foundation to the Commission? To state thisquestion another way, does the constitutionality of this relationshipdepend on the value of the benefits from the Foundation equaling orexceeding the value of the assistance from the Commission?
The answer to this question is not entirely clear. The value of the benefits received by the state through the Foundation's activities is, of course, inextricably linked to the public purpose of the arrangement. It appears, however, that quid-pro-quo economic parity is not required in order to support the legality of the relationship.
If the arrangement is memorialized in a contract, consideration must exist to support the contract. It is axiomatic, as a matter of pure contract law, that a contract is not valid unless supported by adequate consideration. Minyard v. Daking Mill, Inc. 269 Ark. 266, 599 S.W.2d 742
(1980). The validity of the consideration, however, does not depend upon the comparative economic value of the consideration and of what is promised in return. See, e.g., 17 C.J.S. Contracts § 130. It has been held in Arkansas, additionally, with regard to public contracts, that the consideration need not be monetary, and that "public advantage" in some cases will be adequate consideration to support the contract. See, e.g.,Chamber of Commerce v. Pulaski County, 113 Ark. 438, 170 S.W. 1165 (1914) and City of Blytheville v. Parks, 221 Ark. 734, 255 S.W.2d 962 (1953).
The fact that a contract is supported by adequate consideration for purposes of contract law is not tantamount, however, to a determination that the contract necessarily fulfills a public purpose. The existence of consideration supporting a public contract will not validate it where it lacks a public purpose. See, e.g., Needham v. Garner, 233 Ark. 1006,350 S.W.2d 194 (1961). This is a separate inquiry and again, its resolution depends upon all the facts surrounding a particular arrangement. In fact, the other Attorneys General addressing the issue are not in complete accord on whether consideration is required to support such arrangements under the public purpose doctrine or other applicable constitutional provisions. See, e.g., North Dakota Op. Att'y Gen. L-62,supra (consideration required); Louisiana Op. Att'y Gen. 92-657 (consideration required); Texas Op. Att'y Gen. H-1309 (1978) (consideration required); Mississippi Op. Att'y Gen. 98-0676 (some kind of consideration required); Idaho Op. Att'y Gen. 95-7 (1995) (unclear as to whether consideration required); and Kentucky Op. Att'y Gen. 92-87 (consideration not required).
The variance in opinion is due in some part to the varying constitutional provisions of each state's law. The Arkansas Constitution does not contain a "no donation" clause applicable to the state, as is the case in some states. See, e.g., North Dakota Op. Att'y Gen. L-62 (2000 WL 33156050), citing Adams County Record v. Greater North Dakota Association,529 N.W.2d 830 (1995). In these states, the clause is not violated if there is an "exchange for value" supported by consideration. Id. In Arkansas, the most pertinent clause restricts only cities, counties and towns from making "donations." See Arkansas Constitution, art. 12, § 5.[6] Seealso Op. Att'y Gen. 96-320. It is usually suggested that this latter provision, while prohibiting a donation of funds by a county or city to a private entity, does not prohibit a contract with such an entity, supported by adequate consideration assuming, of course, the existence of a public purpose. See, e.g., Op. Att'y Gen. 96-287. The question of whether the "consideration" is required is not as clear, however, when the state itself is involved. In any event, however, an exchange of value with precise mathematical equality does not appear to be required in the circumstances you describe. The benefits received by the public under the arrangement, however, will of course be relevant in determining whether it "subserves the common interest and well-being of the community . . ." and thus supports a "public purpose." Chandler, supra at 258, citingBrodhead v. City of Milwaukee, 19 Wis. 624 (1865).
Question 3 — Would your answer to the first question be affect if theCommission and Foundation entered into annual agreements that specifiedthe obligations and benefits from each organization to the other?
Yes. As noted above, a written agreement is advisable and in some cases is necessary to ensure the fulfillment of the "public purpose."
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] The administrative functions of the "Arkansas Territorial Capitol Restoration Commission" were transferred to what is now the Department of Arkansas Heritage by type 1 transfer in 1975. See Acts 1975, No. 1001, § 4; A.C.A. § 25-3-102 note; and § 25-3-103. Effective August 13, 2001, the name of the Commission is changed to the "Historic Arkansas Museum Commission." See Acts 2001, No. 69.
[2] Article 12, § 2 prevents the General Assembly from passing acts
conferring special corporate powers; art. 12, § 5 prevents counties, cities and towns (but not the state) from obtaining or appropriating money for any corporation, association, institution or individual; art. 12, § 12 prevents the state from assuming or discharging the debt orliability of any county, city, town or corporation, and art. 16, § 1 prevents the state from "lend[ing] its credit" for any purpose whatever.
[3] Other cases discussing the notion of a "public purpose" arise in the tax exemption, revenue bond, or eminent domain context. See, e.g.,Pulaski County v. Jacuzzi Bros. Division, 332 Ark. 91, 964 S.W.2d 788
(1998); Turner v. Woodruff, 286 Ark. 66, 698 S.W.2d 527 (1985); andColumbia County Rural Development Authority v. Hudgens, 283 Ark. 415,678 S.W.2d 324 (1984).
[4] The "illegal exaction provision is found at Arkansas Constitution, art. 16, § 13 and provides that: "Any citizen of any county, city or town may institute suit in behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever."
[5] A more recent "Resolution" of the Foundation amends article 8 of the Articles of Incorporation to authorize the Foundation to "participate in legislative activities and otherwise attempt to influence legislation the sole purpose of which shall be the approval by the relevant legislative body of (i) programs which have been approved by the Arkansas Territorial Restoration Commission for implementation by the staff of the Arkansas Territorial Restoration as part of the Restoration's general educational and historical mission to the citizens of the State of Arkansas; and (ii) appropriations in support of either programs or capital projects which have been approved by the Arkansas Territorial Restoration Commission for the use and benefit of the Arkansas Territorial Restoration."
[6] This provision states that: "No county, city, town or other municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for, or loan its credit to, any corporation, association, institution or individual."