FORDYCE, CITY OF, *v.* DALLAS COUNTY.

4-4932

Opinion delivered February 7, 1938.

*Morton & Sparks,* for appellant.

*Franz E. Swaty,* for appellees.

MEHAFFY, J. On December 19, 1936, the appellee, Dallas county, began this action in the Dallas chancery court against W. R. Benton, collector of said county, alleging in its complaint that claims amounting to several hundred dollars had been filed against the county on account of the construction of the underpass on U. S. highway No. 79, under the St. Louis S. W. Railway tracks in the city of Fordyce; that the city of Fordyce had, by resolution, assumed and agreed to pay these claims; that the said collector had in his possession $1,373.79 due said city on account of the three-mill road tax collected in said city, and prayed for a temporary restraining order to restrain said collector from paying said road tax over to the city of Fordyce until its contract rights under the resolution were adjudicated and until the claims against the county were settled. Attached to the complaint was a certified copy of the resolution. The complaint further alleged that the city of Fordyce was insolvent, and that the plaintiff had no adequate remedy at law.

The resolution of the city council, agreeing to pay the damages caused to real estate owners by reason of the construction of the underpass, was adopted when two of the members of the council were not present, and they testified that they had no legal notice.

The evidence is ample to show not only that the underpass was a needed and valuable improvement, but that it was the wish of the council and the city of Fordyce that it should be constructed. This appeal is prosecuted to reverse a decree in favor of appellees.

The appellant, however, argues that the resolution was void because adopted at a special meeting when two of the members of the council did not have notice of it, and that there was no ratification.

The evidence, however, shows that the citizens generally, as well as the mayor and council, desired the underpass and they knew that they could not get it without agreeing to pay the damages. It appears that Mr. Morton, an attorney at Fordyce, drew the resolution. He stated, however, that he drew it for the mayor as an accommodation. Judge Bradley testified that he went to Mr. Morton's office on the morning that the resolution was adopted by the council; that Mr. Mahew was there at the time. In discussing the matter in Mr. Morton's office with him and Mr. Mahew, Mr. Morton suggested that the county should pay it; said it would not amount to much, and that they did not want to lose the underpass. Judge Bradley told them that he was not going to pay it, but said that if the city will guarantee to protect the county that would be all right, but that he was not going to pay it. Judge Bradley then testified that they asked him to meet with the city council; that when they got there the mayor said they ought to do something about it; that they did not want to lose it, and he wanted to hear from Judge Bradley. Judge Bradley again told them that if they would take care of it he would sign the right-of-way order that evening. Mr. Morton then read the resolution. The county judge afterwards talked to Mr. Mahew, and told him that he was going to the courthouse and sign the order if they would guarantee it. He

was then approached by citizens who asked him to sign the order, and he told them he would not do it unless the city would pay for it. He also testified that he talked with Mr. Morton afterwards, and told him that if the council would guarantee the payment, he would go ahead and fix the order, and that Mr. Morton told him the resolution would take care of it.

The county judge then signed the order and the work was done. It appears that practically everyone knew that the county had proceeded on the promise that the city would pay, and the conduct of the city was such as to justify this belief. Neither a person nor a corporation can, by conduct or words, or both, induce another person to expend money or to become liable for the payment of money, on the promise that they will pay it, and then avoid the payment.

Of course, this conduct would not bind the city to do a thing that it did not have authority to do; but the statute expressly authorizes cities to care for, supervise, and control all public highways, bridges, streets, alleys, public squares and commons within the city, and shall cause the same to be kept open and in repair, and free from nuisance. Under the statute the city would have authority to widen streets, and if necessary to make a bridge over a railroad, or construct a street under the railroad; and if it had authority to do these things, and induced someone else to do it under the promise to pay for it, the city would be liable, although there was no technical ratification.

This court quoted with approval the following, from McQuillian on Municipal Corporations: "A municipality cannot be estopped to question the use of its streets without a franchise, or the validity of a franchise where it has no power to grant such a franchise. . . . On the other hand, if a municipality has the power to grant a franchise and a public service company uses the streets with the knowledge of the municipality, the latter may be estopped to question the right to use the streets without a franchise, or the validity of the franchise granted, where it does not violate statutory or charter require-

ments. For instance, a municipality which had acquiesced for years in the use of its streets by a public service company, which has spent thousands of dollars in connection with such use, and which has received the benefits of such use of the streets and has regulated the use and levied licenses and granted permission as to certain uses, cannot contest the right of the company to use the streets. Likewise, acquiescence by a municipality in the use of streets by a railroad company, pursuant to a grant of such right by the Legislature, precludes the municipality from objecting thereto." *Natural Gas & Fuel Corp.* v. *Norphlet Gas & Water Co.,* 173 Ark. 174, 294 S. W. 52.

The court, in the same case, also quoted with approval a similar statement from Dillon on Municipal Corporations, and then said: "The same equitable principles which would estop the city from questioning the invalidity of the ordinance granted to the Norphlet Gas & Water Company would also estop it from questioning the validity of the contract rights of the defendant."

We, therefore, conclude that the conduct on the part of the city estops it from claiming that it did not agree to pay.

It is next contended by the appellant that the alleged contract was *ultra vires.* If the city had the right to construct the underpass, under the authority given by the statute, then it had a right to make the contract in question. If the city had constructed the underpass itself, it would have been required to pay not only the damages to property owners, but would have had to pay for the construction itself.

We do not think the contract violates art. 12, § 5 of the Constitution. It does not involve the appropriation of money for work to be done in the construction of a state highway. It is an appropriation of money to improve the streets, which is specially authorized by statute.

We think it appears from the evidence that the appellee had no adequate remedy at law, and that the chancery court, therefore, had jurisdiction. The evidence, we think, shows that the city is insolvent; that it would have

been difficult, if not impossible, to collect for the underpass by an action at law.

There are numerous resolutions and affidavits introduced in evidence, and several witnesses testified. The above questions are all that are raised by appellant.

The decree of the chancery court is correct, and, therefore, affirmed.