CITY OF BLYTHEVILLE *v.* PARKS.

5-123                                    255 S. W. 2d 962

Opinion delivered March 9, 1953.

*Elbert Johnson* and *Oscar Fendler,* for appellant.

*Bruce Ivy,* for appellee.

WARD, J. The City of Blytheville, Arkansas, voted a $100,000 bond issue "for the purpose of acquiring additional land for the municipal airport." The issue here involved is whether the proposed use of the proceeds of the bonds violates Section 5, Article 12 or Amendment 13 of the Constitution of Arkansas.

The bonds have been sold and arrangements made to buy the land, but pending further procedure Ira Parks, appellee, a citizen and taxpayer of Blytheville, filed a complaint in Chancery Court challenging the proposed purchase on the grounds above indicated. The City filed an answer, the taxpayer filed a general demurrer, and the trial court sustained the demurrer.

The complaint and the answer, together with the exhibits attached to each, set out all the facts essential to the issue, and the parties agreed that these statements, unless contradicted in the pleadings, would be considered as true. The question presented here is purely a question of law.

*Facts.* In 1947 the U. S. Government permitted the City to use its Army Airport consisting of about 2,600 acres, and in 1949 the Government executed a deed to the City with the right to recapture. Since 1947 the City has made substantial improvements on the grounds and buildings. In 1952 representative citizens of Blytheville, knowing that the Government was in need of suitable air fields, conceived the idea of having the Government reactivate the former air base, believing it would result in much profit to the City and at the same time contribute to the war effort. The plan was fostered by the Chamber of Commerce and other civic organizations and citizens and, after negotiating with Government representatives, it resulted in a "Resolution" being adopted by the City and said civic organizations. The Resolution was to the effect: (1) The City would donate the fee title to the former Army Air Field to the Government; (2) The City would acquire and donate to the Government land for expansion; (3) The Government would have exclusive use of the Air Field; and (4) The City would do certain other things not pertinent to this decision.

Pursuant to the above, it was ascertained that 192 acres would be needed for Government purposes; options, which expire March 14, 1953, were obtained to purchase the required land; the City passed Ordinance No. 535 calling for an election to be held on a proposed bond issue; and the issue was approved by a vote of more than two to one. Wide publicity in the City newspapers regarding the plan in detail was given before the election.

The Government agreed that the deed conveying the 192 acres to it would contain a reverter clause, reading as follows:

". . . should the land cease to be required for military airport purposes as determined by the Head of the Governmental Department or Agency having jurisdiction over said land, all title conveyed herein to the lands described above shall revert to the City of Blytheville, Arkansas, its successors or assigns."

A copy of the proposed deed, containing the above reverter clause, was made an exhibit to the answer.

If the City is allowed to complete its plan, land other than the 192 acres will be purchased out of the proceeds of the bond issue to provide an "Air Field for commercial and private owners of planes," and, in addition, the City is assured "that commercial aircraft transporting passengers and freight will have use of the original Air Field as extended during all reasonable times." No commercial airlines now use the airport.

*Application of the law.* The bond issue was voted pursuant to Amendment No. 13, which authorizes cities of the first and second class, with the consent of the qualified electors, to issue bonds "for the purchase, development and improvement of public parks and flying fields located either within or without the corporate limits of such municipality."

Amendment 13 takes the place of § 1, Art. 16 of the Constitution, and the first paragraph in each reads the same, as follows:

"Neither the state or any city, county, town or other municipality in this state shall lend its credit for any purpose whatever; nor shall any county, city, town or municipality ever issue any interest-bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the indebtedness existing at the time of the adoption of the Constitution in 1874, and the State shall never issue any interest-bearing treasury warrants or script."

While the above paragraph was mentioned by the trial court in its findings, there seems to be no serious contention that it alone supports the decision reached, and this is our view.

There is another clause in the amendment which appellee strongly insists invalidates the proceedings contemplated by the City, which reads as follows:

"No municipality shall ever grant financial aid toward the construction of railroads or other private enterprises operated by any person, firm or corporation, and no money raised under the provisions of this amendment by taxation or by sale of bonds for a specific purpose shall ever be used for any other or different purpose."

We agree with appellee and the Chancellor that this court has plainly held that where bonds are voted for a specific purpose the proceeds cannot be used for a different purpose. We note below a few such cases, all involving this language in Amendment 13.

*City of Stuttgart* v. *McCuing,* 218 Ark. 34, 234 S. W. 2d 209. Bonds voted to construct certain streets were paid out, leaving a balance unexpended, and the City sought to place the money in a different fund to be used on streets. This court said it was in violation of the specific purpose clause.

*Sanders* v. *Green,* 213 Ark. 943, 214 S. W. 2d 67 held that bonds voted to remodel a city hospital could not be used for a different purpose. It was stated that the funds, as originally voted, became a trust fund in the hands of the City to be used for the purpose designated.

To the above effect are *Yancey* v. *City of Searcy,* 213 Ark. 673, 212 S. W. 2d 546, and *City of West Memphis* v. *Jordan,* 212 Ark. 739, 208 S. W. 2d 164.

In our opinion the above rule, though clearly announced, does not constitute a bar to the consummation of the City's undertaking herein, for the following reasons:

*First:* The City is not, as contended by appellee, donating the land to the Government. We make this statement for two reasons: (a) There are many benefits which the City would expect to receive if the plan goes

through, such as accrue as a result of an increase in business and population. That these are desirable considerations from the City's viewpoint is attested by the activities of Chambers of Commerce everywhere. In the case of *Little Rock Chamber of Commerce* v. *Pulaski County*, 113 Ark. 439, 168 S. W. 848, at page 444, it was said: "If the county has the power to take the public advantage into consideration at all, it has the right to base the conveyance entirely upon that as the moving consideration." It was held that public advantage did constitute consideration. (b) Appellee seems to have overlooked the very important fact that, while the 192 acres were being deeded [or donated] to the Government, the deed provided that the land would be returned [greatly improved] to the City when the emergency passes. It seems to us this, in effect, is not different from a lease by the City to the Government for the period of emergency. We cannot assume that our sovereign Government will fail to live up to its obligation or that it will act arbitrarily in doing so, nor can we assume the emergency will not pass within a reasonable time. It is not contended the City has no power to lease the property. In *Halbut et al.* v. *Forrest City*, 34 Ark. 246, p. 256, we find this statement:

"Where the town may be authorized to rent a building for its own use, it will not vitiate the contract to allow it to be used for other purposes of a public nature."

*Second:* The crux of appellee's contention and of the trial court's finding is: For the City to deed this property [192 acres] to the Government would be diverting the funds for a purpose not set forth in the ordinance. In the beginning we are impressed with the fact that the prohibition is against using *funds* for a different purpose. Here the funds will be spent for the land, and the *land* will be *diverted*—not the *funds*. However, the distinction may not be sound, so we will consider *land* and *funds* as the same in this instance.

We are not convinced that the plan here proposed constitutes a diversion of funds, or that the funds will

be used for any purpose other than the one specified in the ordinance. As has been pointed out, the purpose for which the money was voted was to acquire a municipal airport. If this plan materializes, what will the City receive for its money? We list below what the evidence substantiates:

(a) The City will have an air field for its all-purpose use. Land, other than the 192 acres, will be acquired out of the bond issue for such use. There is nothing to indicate this will not be ample for all present demands.

(b) For the City's benefit, commercial aircraft transporting passengers and freight can use the entire base at all reasonable times. This is an added service to the City which it has not enjoyed before.

(c) When the emergency is over the City will have for its exclusive use all the land it is now buying plus, perhaps, millions of dollars' worth of installations and improvements which it could, otherwise, never hope to obtain. In addition to the above, there is a probability the Government will turn over to the City the 2,600-acre Army Airport, greatly improved, just as it formerly did.

As it appears to us, there will be no diversion of funds for a different purpose. All the money will be spent for the original purpose—to secure the best possible airfield for the City. It must be conceded, of course, that the *method* of achieving the purpose was not embodied in the ordinance, but such designation was not practicable nor was it required by law. While we think the fact that the citizens of Blytheville were apprised of the *method* before they voted makes no difference in the legal aspect of this case, it can be a matter of pride to the promoters that nothing has been concealed.

We are unable to find anything in § 5, Art. 12 of the Constitution that prohibits the City from proceeding with the plan outlined. It reads as follows:

" § 5. *Political subdivisions not to become stockholders in or lend credit to private corporations.*—No

county, city, town or other municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for, or loan its cerdit to, any corporation, association, institution or individual.''

In support of its contention to the contrary, appellee cites *Russell* v. *Tate,* 52 Ark. 541, 13 S. W. 130, 7 L. R. A. 180; *City of Little Rock* v. *Community Chest,* 204 Ark. 562, 163 S. W. 2d 522, 142 A. L. R. 1072; and *City of Fordyce* v. *Dallas County,* 195 Ark. 552, 113 S. W. 2d 500.

Our consideration of these opinions convinces us they are not applicable here. The City is not making itself a partner with nor lending its credit to the United States Government.

We agree with the Chancellor that Act 13 passed by the 1953 General Assembly could give to the City no power prohibited by the Constitution.

Reversed.

In view of the emergency existing an immediate mandate shall issue.

GRIFFIN SMITH, Chief Justice, concurring. I agree with the result for these reasons: We should conclusively presume good faith upon the part of the government. Advantages, from a municipal standpoint, are greater— rather than less—than would flow from an airfield exclusively operated by the City. The coöperative plan is one affecting every person who bears allegiance to our national institutions.

Experience teaches that a condition of war, or what is sometimes termed the emergency of war, invariably terminates; and, while the transaction between Blytheville and the federal government is in terms a transfer, the overall plan contemplates usage during a period of stress, with reliance upon sovereign integrity for eventual restoration. In these circumstances I am willing to say that the spirit of Amendment No. 13 is not violated.

GEORGE ROSE SMITH, J., dissenting. We are told in the pleadings and in the briefs that this proposal is approved by the chamber of commerce, by luncheon clubs,

and by other civic organizations in Blytheville. But, as I see it, their blessing is not enough. The plan must also be sanctioned by Amendment 13 to the Constitution, and that authority is not to be found.

The majority give rather less consideration to the constitutional issue than to the practical benefits that may be expected to accrue to the city and its business-men. While I do not regard these practical benefits as being of great importance, it is nevertheless true that we can examine the basic question with more detachment if we first note that this particular proposal is not essential to the realization of these benefits. For example, the majority say that as a result of this plan the city will have an airport of its own, since the bond issue will be used to purchase land in addition to that being donated to the army. The short answer to this argument is that the city should confine itself to acquiring that other land, in-stead of spending 80% of the bond proceeds upon the property that is to be given away. Again, the majority say that the city will regain the property ''when the emergency is over,'' under the reverter clause. That may be a possibility, even a probability, but it is not a cer-tainty. As a matter of fact the reverter provision makes no reference to an emergency; it merely provides for a reversion ''should the land cease to be required for mili-tary airport purposes'' as determined by the federal gov-ernment. It is quite apparent that the field might be used as a permanent military installation, in which case it would never revert.

When these makeweight reasons are laid aside the real issue emerges as this: Does Amendment 13 authorize the levy of a property tax for the purchase of land that is to be given to the United States for use as a military airbase? One has only to read the amendment to see that this scheme is not within its purview. Amendment 13 permits a city to levy a property tax for the acquisition or construction of streets, parks, flying fields, sewers, fire fighting apparatus, city halls, auditoriums, libraries, hospitals, waterworks, and other enumerated facilities. The point is that these are all commonplace municipal

functions and have been so considered for a good **many** years. It was not necessary to amend the Constitution merely to enable a city to pave a street or build a city hall. What the amendment did was to authorize the levy of a special tax so that the city could supply ordinary public services that might otherwise have been beyond its means.

One of the projects named in the amendment is "the purchase, development and improvement of public parks and flying fields." To me it seems too clear for dispute that the sole purpose of this clause was to empower a municipality to issue bonds for the acquisition of a municipally owned and municipally operated airport. I do not suppose that the majority would contend that the city of Blytheville could, under Amendment 13, gird itself for war by the construction of a military airstrip of its own. Still less do I see how the city can proceed under this amendment to acquire land for the declared purpose of donating it to the government for military use.