The Honorable Lindsley Smith State Representative
340 North Rollston Avenue Fayetteville, AR 72701-4178
Dear Representative Smith:
I am writing in response to your request for my opinion on various questions arising from the following reported facts:
 The Walton Arts Center in Fayetteville was a joint project of the University of Arkansas and the City of Fayetteville. The City of Fayetteville used bond proceeds backed by its portion of the County Sales Tax in 1986 while the U of A used a Walton Family gift. In 1989, the city individually obtained 3.19 acres for the construction of a parking lot next to the Walton Arts Center. The City constructed the lot, which has been known as the Walton [A]rts Center Parking Lot ever since.
 This parking lot has been offered primarily as free parking for citizens wanting to attend plays and performances at the Walton Arts Center or go to bars and restaurants on Dickson Street. The City has worked with the Walton Arts Center Staff occasionally to reserve spaces for school buses in the parking lot.
 Both the operating arm of the Walton Arts Center, the Walton Arts Center Council, Inc.[,] and the financial arm, the Walton Arts Center Foundation, Inc.[,] are specifically denoted to be agents of the City of Fayetteville and the University of Arkansas in their Articles of *Page 2 
Incorporation. The Walton Arts Center now desires to manage the Walton Arts Center Parking Lot (almost 300 parking spaces) by charging for parking every evening and keeping the revenue received to support its general programming. It would also like to reserve spaces (possibly around 50) for its major donors on performance nights. If these spaces were not occupied by 30 minutes after a performance began, they would be made available to the paying general public just like the rest of the parking lot.
Against this backdrop, you have posed the following questions:
 1. In light of the general public's constant use of the Walton Arts Center Parking Lot, can the City of Fayetteville utilize A.C.A. 14-54-104(2) to "lease out such portions (of public grounds) as may not for the time being be required for corporate purposes. . . ."?
 2. Is there other statutory (A.C.A. 14-54-302(a)) or inherent power for the City of Fayetteville to lease out the parking lot to the Walton Arts Center Council or Foundation, especially because both entities are officially its agents?
 3. Must the City of Fayetteville receive fair market value for the lease of the Walton Arts Center Parking Lot to the Walton Arts Center or can the parking management of the lot be sufficient consideration (especially because the Walton Arts Center Council and Foundation are agents of the City)?
 4. Can the City of Fayetteville (with proper ordinance in place) issue parking citations and prosecute violators in District Court for drivers who overpark in the Walton Arts Center parking lot after the lot is leased to and managed by the Walton Arts Center?
 5. If the City of Fayetteville leases and assumes the management of privately owned parking lots, can it issue parking citations to be prosecuted in District Court if: a) the City Council sets all parking rates by city ordinance; or b) the City agrees to *Page 3 
issue citations if parkers do not properly pay the rates set by the private property owner?
RESPONSE
Based upon the facts recited, I believe the answer to your first question is, in all likelihood, "no." Although A.C.A. § 14-54-104(2) indeed authorizes a city to lease out surplus property not currently "required for corporate purposes," under the circumstances set forth in your factual recitation, the property at issue would not qualify as surplus. With respect to your second question, although a city has no inherent authority to lease out property or to perform any other municipal function, A.C.A. § 14-54-302(a) does generally authorize municipalities to lease out property under their control. However, I believe any such lease must serve a public purpose and be supported by adequate consideration. The term "consideration" can be read in this context as including any public advantage realized from the lease. With respect to your third question, management of the Lot might be considered adequate consideration for the lease so long as the management would result in an adequate public advantage — a proposition whose applicability under the proposed circumstances seems debatable. Only a finder of fact could determine whether this factual predicate had been met. With respect to your fourth question, I believe that if the proposed lease is properly approved by ordinance and supported by adequate consideration conferring a public benefit, any applicable parking restrictions might be enforced by the city and prosecuted in district court. The question of whether these conditions have been met in any particular case is one of fact that I cannot resolve in a formal opinion. I have further found scarce authority directly addressing this issue. With respect to your fifth question, I have found no proscription against a city leasing and assuming the management of a privately owned parking lot, so long as the lease and the management would serve a proper public purpose. I cannot address the factual question of whether these conditions might be met in any particular case. With respect to the latter part of your question, assuming the conditions just recited have been met, I believe a city could issue and a district court might adjudicate tickets for offenses defined by city ordinance. However, I question whether a city could issue tickets for offenses defined by a private property owner, particularly if the private owner were to receive the proceeds of the tickets. It is difficult to conceive how the latter arrangement would result in adequate consideration to and a public benefit conferred upon the city. Only a finder of fact acquainted with all the attendant circumstances could judge the propriety of such a relationship. *Page 4 
 Question 1: In light of the general public's constant use ofthe Walton Arts Center Parking Lot, can the City of Fayettevilleutilize A.C.A. 14-54-104(2) to "lease out such portions(of public grounds) as may not for the time being be required forcorporate purposes. . . ."?
In my opinion, accepting as correct your representation that the public's use of the Walton Arts Center Parking Lot (the "Lot") is "constant," I believe the answer to your question is "no."[1]
A city's authority to lease out surplus property is set forth at A.C.A. § 14-54-104(2) (Repl. 1998), which authorizes a city of the first class, in pursuit of "the public welfare, safety, comfort, and convenience of [its] inhabitants," to do the following:
 To alter or change the width or extent of streets, sidewalks, alleys, avenues, parks, wharves, and other public grounds, and to vacate or lease out such portions thereof as may not for the time being be required for corporate purposes, and where lands have been acquired [by] or donated to the city for any object or purpose which has become impossible or impracticable to achieve, the lands may be *Page 5 
used or devoted for other proper public or corporate purposes or sold by order of the city council and the proceeds applied for public or corporate purposes.
(Emphasis added.) I believe the highlighted portion of this statute dictates that your question, as posed, be answered in the negative.
In light of this statute, you appear to be asking whether a publicly owned facility that is subject to constant public use might be leased out under the statute's authorization of such a lease only when the property "may not for the time being be required for public purposes."[2] Based on your suggestion that the Lot is indeed subject to "constant" public use, I believe the answer to this question is "no," since a publicly owned facility subject to such use would not, "for the time being," qualify as no longer "required for corporate purposes." Simply stated, constant public use of corporate property appears necessarily to serve a public purpose, thus foreclosing the application of a statute that authorizes the lease of property only if it is not
required for public use (i.e., a "corporate purpose"). Assuming, then, that a court were to find that the Lot is indeed subject to "constant" public use, it would almost certainly conclude that the statute does not warrant leasing out the Lot as surplus realty.
Question 2: Is there other statutory (A.C.A. 14-54-302(a)) orinherent power for the City of Fayetteville to lease out the parkinglot to the Walton Arts Center Council or Foundation, especiallybecause both entities are officially its agents?
In my opinion, the referenced statute would authorize the lease if the lease served a public purpose and were supported by adequate consideration. Any public advantage flowing from the proposed lease that advances the Center's public mission might serve as an element of consideration sufficient to satisfy the requirements under the statute. Only a finder of fact could determine whether these conditions have been met. *Page 6 
As an initial proposition, a city has no "inherent power" of any sort. I believe the following principle forecloses any recourse to this concept as potentially justifying the lease:
 "Municipal corporations are creatures of the legislature and as such have only the power bestowed upon them by statute or the Arkansas Constitution. Jones v. American Home Life Ins. Co., 293 Ark. 330, 738 S.W.2d 387 (1987). It is well settled that municipal corporations have no inherent powers and can exercise only (1) those expressly given to them by state statute or the Arkansas Constitution, (2) those necessarily implied for the purposes of, or incident to, the express powers, and (3) those indispensable, not merely convenient, to their objects and purposes. Cosgrove v. City of West Memphis, 327 Ark. 324, 938 S.W.2d 827 (1997). Finally, any substantial doubt about the existence of a power in a municipal corporation must be resolved against it. Id.; City of Little Rock v. Cash, 277 Ark. 494, 644 S.W.2d 229 (1982); Town of Dyess v. Williams, 247 Ark. 155, 444 S.W.2d 701 (1969)."
City of Cave Springs v. City of Rogers,343 Ark. 652, 657, 37 S.W.3d 607 (2001), quoting Stilley v.Henson,342 Ark. 346, 355, 28 S.W.3d 274, 279 (2000) (emphasis added).
However, notwithstanding the absence of any "inherent power" in the City to lease the Lot to the Council or Foundation, [3]
A.C.A. § 14-54-302(a)(1) (Supp. 2009) grants the following express authority to enter into such a lease:
 Municipal corporations are empowered and authorized to sell, convey, lease, rent, or let any real estate or personal property owned or controlled by the municipal corporations. This power and authorization shall extend and apply to all such real estate and personal property, including that which is held by the municipal corporation for public or governmental uses and purposes.
(Emphasis added.) *Page 7 
In Ark. Op. Att'y Gen. No. 2008-179, I interpreted the scope of this statute as follows:
 [A] city or town is expressly authorized by A.C.A. § 14-54-302 (Supp. 2007) to "buy, sell, convey, lease, rent, or let any real estate or personal property owned or controlled by the municipal corporation . . ." id. at (a)(1) (emphasis added), [4] subject to the requirement that the lease contract be authorized by resolution and approved by a majority of the city council. Id. at (c). In my opinion, however, this statutory authority is qualified by an implied proviso that the lease agreement must serve some legitimate public purpose. See
A.C.A. § 14-42-307(a)(1) (restricting the authority of municipalities to the exercise of "powers relating to municipal affairs.")
In accordance with this summation, it would appear to be impermissible to lease to an entity serving purely private interests property that is currently serving a public interest.[5]
As noted above, I further believe that any lease authorized by A.C.A. § 14-54-302(a) must further be supported by adequate consideration. As I noted in Ark. Op. Att'y Gen. No. 2008-133:
 As a general matter, real property transactions must be supported by adequate consideration. For a discussion of this issue, see Op. Att'y Gen. Nos. 2007-220 and 96-351. It is also well established as a general proposition that a municipal corporation may convey public property or an interest therein based upon consideration other than *Page 8 
money. See, e.g., City of Blytheville v. Parks, 221 Ark. 734, 255 S.W.2d 962 (1953); Little Rock Chamber of Commerce v. Pulaski County, 113 Ark. 439, 168 S.W. 848 (1914); Op. Att'y Gen. 2002-099.
Among the permissible nonmonetary forms of consideration that might bear upon your request is the admittedly amorphous category of "public advantage," which the proposed arrangement you describe might arguably be characterized as serving.
With regard to the issue of consideration, I agree with my predecessor's analysis in Ark. Op. Att'y Gen. No. 2001-102, which addressed the propriety of a projected lease of city property to establish a private school:
 Determining the adequacy of consideration will obviously entail a factual inquiry of the sort I am neither authorized nor equipped to conduct. I will note, however, that the Arkansas Supreme Court has held that in certain circumstances "public advantage" can constitute adequate consideration. See City of Blytheville v. Parks, 221 Ark. 734, 255 S.W.2d 962 (1953).
In the opinion just cited, my predecessor questioned whether the public advantage flowing from the establishment of a private school might constitute consideration sufficient to mitigate the fact that an existing public school already served the geographical area at issue.
Specifically with respect to the fact situation you have recited in your request, you appear to imply that the proposed lease might indeed be characterized as supported by adequate consideration because the Council and the Foundation — one of which (most likely the Council, see note 1 supra) would presumably be the lessee — are "officially [the City's] agents."[6] The reasoning underlying this suggestion appears to be that inasmuch as the City's "agent" would necessarily be acting on the City's behalf, the agent's actions would realize a public advantage. *Page 9 
As discussed further in my response to your third question, I am not situated to address the factual issue of what advantages, if any, the City might realize as a result of the Council's proposed lease of the Lot. As I noted in Ark. Op. Att'y Gen. No. 2008-133:
 The question of whether the consideration for a particular transaction is adequate is a question of fact that can be determined only by an authorized finder of fact, taking into account all of the relevant information, such as the value of the property, the proposed use of the property, and the benefit that will accrue as a result of the conveyance. See Op. Att'y Gen. 2003-206.
Paramount among the areas of factual uncertainty is the question of what changes, in terms of benefits realized by the City, the proposed lease would realize. It is unclear, for instance, what practical consequences the Council's "management" of the Lot would have upon the City. Would such management restrict the general public's access to parking in the Lot? Would it result in a diversion of parking revenues, whether current or potential, from the City to the Center? If the answer to this second question is "yes," would this diversion nevertheless serve the public interest in that it would realize the ends set forth in the interlocal agreement? If so, would the public benefits be any greater than they are currently? Does it matter that the prospective lessee is organized as a private, nonprofit corporation committed in the first instance to serve the Center's, as distinct from the City's, interests?[7] Does it matter that the prospective lessee is designated a "body politic and corporate," and, if so, how does it matter? If the lessee is indeed the City's "agent," would not the proposed arrangement effectively amount to the City *Page 10 
indirectly leasing the property from itself? Furthermore, if the Council's sole role as lessee would be to "manage" the Lot as the City's agent, what consideration would — or, for that matter, could — flow to the Council as a result of the arrangement?
As I understand the proposal set forth in your request, the Council would lease the Lot, which is currently not generating income, in order to charge for parking and to devote the revenues thereof to serve the interests of the Center. Presumably, this arrangement would generate a public advantage that might amount to consideration flowing to the City inasmuch as this use of revenues would advance the interests of the Center, in which the City has a fee simple ownership interest. However, even under current circumstances, which do not involve the City's sacrifice of a partial ownership interest in the Lot, the City might itself charge for parking and invest the proceeds in Center operations. Moreover, should the City decide to charge for parking, it might currently elect to invest the proceeds in any other public project it feels is more immediately deserving of public funding than the Center. Viewed from this perspective, the City's grant to the Council of a leasehold in and binding management authority over the Lot might be seen not as an conferring a public advantage to the City, but rather as restricting the advantage the City might realize in being able to devote parking revenues to any project it chose. In my opinion, this issue might factor significantly in a court's determination as to whether the proposed arrangement would indeed involve adequate consideration flowing to the City.
Despite the factual background I have been provided, these and other questions remain as ones that I am neither authorized nor situated to address. Only a finder of fact acquainted with all the relevant circumstances could make a determination whether the City's leasing the Lot to the Council would be supported by adequate consideration. I must note, however, that it is unclear why the City would convey a limited property interest in the Lot to an entity whose sole function even absent such a conveyance would be to serve the City's interests as reflected in the interlocal agreement.
Question 3: Must the City of Fayetteville receive fair marketvalue for the lease of the Walton Arts Center Parking Lot to theWalton Arts Center or can the parking management of the lot besufficient consideration (especially because the Walton Arts CenterCouncil and Foundation are agents of the City)? *Page 11 
For the reasons set forth immediately above, I am unable categorically to answer this question, which can be adequately resolved only by a finder of fact acquainted with all the relevant circumstances. I strongly suspect, however, that a reviewing court would closely scrutinize an arrangement whereby a city purported to lease its property to a private nonprofit corporation for the purpose of having that corporation "manage" the property on the city's behalf. Without presuming to characterize the facts, I will predict that a court would vigorously inquire into whether the proposed lease would actually benefit the City, given that the City currently owns the Lot without restriction and that under the proposed lease, the City would apparently still be charged with enforcing parking restrictions on the Lot, with any revenues realized possibly going to the Council[8] as opposed to the City.
As noted immediately above, I question whether the prospective lessee's status as the City's agent in advancing a particular project might in some way moot or avoid the issue of whether adequate consideration would flow to the City under the proposed lease. In this regard, I find something counterintuitive, if not flatly self-contradictory, in the concept of a principal leasing property to its own agent in order to serve the principal's overall interests. Indeed, inasmuch as an agent stands in the shoes of the principal, the arrangement contemplated would appear to amount to the principal's effectively leasing property to itself. Any such arrangement would appear to be inconsistent with the self-evident proposition that a lessee normally leases property in order to pursue its own, not the lessor's, interests.
Even assuming that that the lease in this particular case mightadvance one particular municipal interest — namely, the productive operation of the Center — it might at the same timeforeclose the City from using the property in other more productive ways. You indicate that the Center, presumably acting through the Council, would retain "the revenue received [every evening] to support its general programming," further reserving spaces to accommodate its "major donors." You further indicate that these reserved spaces, if unoccupied, would be made available to the general public only "30 minutes after a performance began." It is far from apparent that any such restriction of access to serve exclusively Center priorities would benefit the City in a way that the City's current unfettered management *Page 12 
authority over the Lot does not. Also questionable as consideration flowing to the City is the Council's proposed retention under the lease of parking revenues that the City might itself impose and presumably dispense in whatever manner it chooses — including, possibly, to funding the Center's activities. The core question thus remains: even assuming the Council's status as an "agent" of the City, what does the City stand to gain by ceding to the Council a limited ownership interest in and an undefined "management" authority over the Lot? This question is one that I am not situated definitively to answer, although I can and will opine that it might weigh heavily in a court's consideration of the issues.
Having expressed these concerns, I must stress my inability to determine from your abbreviated factual summary precisely what functions the Council would perform in managing the Lot and what benefits, if any, the City might realize from the Council's management. I am consequently unable to opine on the adequacy of the consideration supporting the proposed arrangement. I can only reiterate that the management of a City-owned lot by a corporate agent of the City, whatever that management might entail, would normally be characterized as a contract for services that would not entail a conveyance of a leasehold estate. Again, however, without clarification regarding what business relationship the proposed arrangement would entail, I am unable to opine regarding the adequacy of consideration.
Question 4: Can the City of Fayetteville(with proper ordinance in place) issue parking citations andprosecute violators in District Court for drivers who overpark inthe Walton Arts Center parking lot after the lot is leased to andmanaged by the Walton Arts Center?
In my opinion, the City could issue and prosecute parking citations on a Lot leased and managed by the Council on behalf of the Center so long as the City did so in pursuance of its municipal police powers. I believe this conclusion would apply regardless of whether the proposed lease were classified as a lease to a public or to a private entity. As regards the propriety of such a lease, your reference to a "proper ordinance" appears to assume what you have asked me to determine — namely, whether the City might, indeed, "properly" ticket and prosecute parking offenders on a lot leased under the circumstances described in your request. In addressing this question, I can do no more than set forth the general operative principles that might apply. *Page 13 
The Arkansas Supreme Court has stated that the validity of an ordinance will turn on whether it comes within the scope of the powers granted to cities and towns, is promulgated in the proper exercise of police powers and bears some reasonable relation to the public health, safety, morals, welfare, comfort, or convenience.Wilkins v. City of Harrison,218 Ark. 316, 319, 236 S.W.2d 82 (1951). An ordinance must not be arbitrary, capricious, or unreasonable. Johnson v. SunrayServices, Inc.,306 Ark. 497, 505, 816 S.W.2d 582 (1991). Section 14-55-102 of the Code (Repl. 1998) grants municipal corporations "power to make and publish bylaws and ordinances, not inconsistent with the laws of the state, which, as to them, shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof." Section 14-43-601 (Repl. 1998) defines "municipal affairs" as including "all matters and affairs of government germane to, affecting, or concerning the municipality or its government," with the exception of certain itemized "state affairs" that do not bear on your request. In my opinion, given the City's co-ownership of the Center and its consequent stake in the Center's effective operation, the regulation of parking on the Lot might well fall within the category "matters and affairs of government germane to, affecting or concerning the municipality." As noted above, however, only a finder of fact acquainted with all the attendant circumstances could definitively opine to this effect.
The Code contains various provisions that relate specifically to traffic and parking ordinances. See, e.g., Garrison v. City ofAlpena, 234 Ark. 170, 171, 350 S.W.2d 690 (1961) (recognizing the authority of cities to pass local traffic ordinances to regulate, warn or guide traffic); A.C.A. § 27-49-106(b)(1) (Supp. 2009) (acknowledging the authority of local officials in the exercise of their police powers to "[r]egulat[e] the standing or parking of vehicles, including the ability to establish districts for the purpose of limiting the time, place, and manner of public parking in designated areas"); A.C.A. § 14-301-101(1) (1987) (directing the city council to "[h]ave the care, supervision, and control of all public highways, bridges, streets, alleys, public squares, and commons within the city"); A.C.A. § 27-15-306(b) (Repl. 2008) (expressly authorizing any law enforcement officer to enforce on the facilities of any "private agency" the parking provisions of the Access to Parking for Persons with Disabilities Act, A.C.A. §§ 27-15-301 through-316 (Repl. 2008)[9];Hartson v. City of Pine Bluff,270 Ark. 748, 751, 606 S.W.2d 149 (1980) *Page 14 
(holding that municipal officers could issue traffic citations on private parking lots so long the cited conduct amounted to a violation of law). Although in Hartson no state or local ordinance existed barring the conduct that led to issuance of the ticket, the proposal set forth in your question anticipates that the City would enact an ordinance setting forth the parking requirements on the Lot.[10] The requirement that a law must exist before its violation might give rise to a citation would thus appear to have been met in your hypothetical. Regardless of whether the Council — which is variably designated a private nonprofit corporation, a "body politic and corporate" and an "agent" of the City, see discussion supra — should be classified as a prospective "private" or "public" lessee, the above recited authorities would appear to authorize the City by ordinance to enter into such a lease in order to advance the public welfare, safety and convenience of its inhabitants, City of Ft. Smith v. VanZandt, 197 Ark. 91, 94, 122 S.W.2d 187 (1938) — a grant of authority that can presumably extend, at least under limited circumstances, to include the regulation of parking in areas that are not in themselves "public." Cf. Macedonian OrthodoxChurch v. Planning Board of Randolph,636 A.2d 96 (N.J.Super. A.D. 1994) (a municipality can exercise its *Page 15 
general police powers to deal with problems of traffic and parking so that the character of a particular residential neighborhood is preserved). Determining whether a city might regulate parking on a city-owned parking lot leased to a private nonprofit corporation that has also been designated "a body politic and corporate" — regulation that might arguably be characterized as serving the City's interest in maintaining a publicly owned arts center — is a judicial undertaking to be pursued along the lines suggested in my responses to your previous questions.
Question 5: If the City of Fayetteville leases and assumes themanagement of privately owned parking lots, can it issue parkingcitations to be prosecuted in District Court if: a) the City Councilsets all parking rates by city ordinance; or b) the City agrees toissue citations if parkers do not properly pay the rates set by theprivate property owner?
This question appears to have nothing to do with the proposed arrangement set forth in the factual recitation accompanying your overall request, since under the facts as recited in this particular question the City would be leasing property from a private entity, rather than a possibly private entity leasing property from the City. Accordingly, I will assume this question is unrelated to your previous questions, which appear focused particularly on the relationships among the City, the Center, the Foundation and the Council.
As a general proposition, cities of the first class are authorized to enter into contracts. A.C.A. § 14-54-101(2) (Repl. 1998). In my opinion, this power would include the city's leasing property whose use would serve a public interest, notwithstanding the fact that the city would own only a leasehold interest in the property, with the private lessor retaining a fee simple interest. See, e.g., Ark. Ops. Att'y Gen. Nos. 2005-215 (opining that a county's leasing a firing range from a private entity might be permissible if the county operated the range, the public had equal access to the facility and the lease were deemed to serve a public purpose); 2003-047 (opining that cities have the authority to lease property for purposes of maintaining an animal shelter even if the property is located outside the city limits).
For reasons set forth in my response to your previous question, assuming the City would lease and manage the facility for its own purposes in meeting municipal parking needs, realizing public parking revenues in the process, I believe it would be permissible to issue and to prosecute parking citations under the circumstances *Page 16 
set forth in subsection (a) of your question. However, I question whether the City could do so under the circumstances set forth in subsection (b), which appears to envision the City managing a private parking lot solely on behalf of the lot's private owner. It is unclear how the City would realize any benefit from such an arrangement, which would invite challenge as serving no public purpose and hence constituting a misappropriation of public funds and an illegal exaction under Ark. Const. arts. 12, § 5 and 16, § 13.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
DM/JHD:cyh
Enclosure
[1] By way of preface to my later discussion of various issues, some factual background appears warranted. You report that the City owns the Lot. The financing, construction and management of the Walton Arts Center (the "Center"), which abuts the Lot, was authorized pursuant to an interlocal agreement, see
A.C.A. § 25-20-101 et seq. (Repl. 2002 Supp. 2009) (the Interlocal Cooperation Act, authorizing the creation of any joint enterprise between or among public entities that each of the entities would have been authorized to undertake individually), between the City of Fayetteville (the "City") and the University of Arkansas (the "University"), which jointly own the Center as tenants in common. See the attached Ark. Op. Att'y Gen. No. 2007-178 (discussing the organization of the Center and its corporate affiliates). You indicate in your factual recitation that the Walton Arts Center Council, Inc. (the "Council") is "the operating arm of the Walton Arts Center" and that the Walton Arts Center Foundation, Inc. (the "Foundation") is the Center's "financial arm." As discussed in detail in Opinion No. 2007-178, both of these entities are organized as private nonprofit corporations.
The Foundation and the Council's annual budgets, pursuant to the interlocal agreement, are subject to approval by the City Manager and the University Chancellor. Although the Council is further designated in its articles of incorporation as an agent of the City and the University, the Foundation is not so designated. Both the Council and the Foundation are further identified in their respective certificates of incorporation as "bod[ies] politic and corporate." The Foundation is charged in its articles with managing an endowment and financing the Council's construction, management and operation of the Arts Center. The City and the University both reportedly contributed $1.5 million to capitalize the endowment fund. Given this structure, I assume the City's proposed lease of the Lot would be to the Council as the Center's "operating arm."
[2] As stated by my immediate predecessor: "[A] `public purpose' has been defined as a purpose that involves the welfare of the community and its inhabitants that directly benefits the public,see Op. Att'y Gen. 2004-269 (quoting Op. Att'y Gen. 1991-410). . . ." Op. Att'y Gen. 2005-248 at n. 2. For a more in-depth discussion of the so-called "public purpose doctrine," see Ark. Op. Att'y Gen. 2004-311.
[3] As I concluded in note 1, supra, the Council, as the Center's "operating arm," would appear to be the logical lessee under the contemplated arrangement. To the extent that the Foundation only manages the endowment and finances the Council's operations, it would presumably not be the lessee.
[4] As amended by Acts 2005, No. 436, § 1, this statute currently reads as recited above. The amendment is immaterial for purposes of my discussion.
[5] This implicit proscription distinguishes this statute from A.C.A. § 14-54-104(2), discussed supra, which I believe authorizes leasing to purely private interests only surplus
property not devoted to "public or governmental uses and purposes" as contemplated in A.C.A. § 14-54-302(a)(1). This logical distinction enables me to read the two statutes together as not being in conflict. It is a basic axiom of statutory construction that legislative enactments alleged to be in conflict must be reconciled, read together in a harmonious manner and each given effect, if possible. Gritts v. State,315 Ark. 1, 864 S.W.2d 859 (1993); City of Fort Smith v.Tate, 311 Ark. 405, 844 S.W.2d 356 (1993).
[6] By way of correction, as pointed out in note 1 supra, only the Council, in its articles of incorporation, is designated an agent of the City.
[7] As regards the authority of a municipality to contract with a private nonprofit corporation, I remarked as follows in Ark. Op. Att'y Gen. No. 2007-153:
 Cities and counties clearly can enter into contracts that are supported by valid consideration. See Ops. Att'y Gen. Nos. 1998-025 and 97-250; A.C.A. § 14-54-101(2); City of Ft. Smith v. Bates, 260 Ark. 777, 544 S.W.2d 525 (1976); City of Harrison v. Boone County, 238 Ark. 113, 378 S.W.2d 665 (1964). Moreover, this authority includes the power to contract with nonprofit organizations. See Woodruff v. Shockey, 297 Ark. 595, 764 S.W.2d 431 (1989). Such contracts have been upheld as not being in violation of Article 12, § 5. See Arkansas Uniform Linen Supply v. Institutional Services Corp., 287 Ark. 370, 700 S.W.2d 358 (1985).
However, this authority to contract with a private nonprofit corporation is obviously conditioned upon the municipality's receiving adequate consideration as a result of the bargain.
[8] Despite your suggestion that the Center, as opposed to the Council or the Foundation, would be the lessee in the proposed transaction, it would appear that the Council, as the City's "operating arm" funded through the Foundation, would be the logical lessee. See n. 1, supra.
[9] The term "private agency" is defined in the Act as meaning "any person, firm, association, organization, or entity, other than a public agency doing business with or providing accommodations for the public, whose customary and normal operations include the providing of parking spaces as a means of accommodating the general public or a select clientele or membership[.]"
I do not consider the legislature's acknowledgment in this statute of a city's authority to enforce the Act on private property as being an exercise of the principle expressio unius est exclusioalterius, which the Arkansas Supreme Court has designated "a fundamental principle of statutory construction that the express designation of one thing may properly be construed to mean the exclusion of another." Chem-Ash, Inc. v. ArkansasPower Light Co., 296 Ark. 83, 751 S.W.2d 353 (1988);Venhaus v. Hale, 281 Ark. 390, 663 S.W.2d 930 (1946). Rather, I consider this statute as reflecting no more than the legislature's encouraging municipalities to use their police powers to advance the interests of the disabled on private, as well as public, property. I do not believe the statute necessarily forecloses a city from enforcing on private property local ordinances dealing with situations other than access to disabled parking.
[10] Illustrating at a procedural level, and acknowledging at a substantive level, a city's authority over the issuance of local parking citations, A.C.A. § 27-50-502(c) (Supp. 2009) authorizes any city to substitute for the uniform traffic citation form prepared by the Arkansas State Police "uniform citation forms for use in enforcement of violations of its municipal code ordinances for offenses other than moving traffic law violations." See
Ark. Op. Att'y Gen. No. 2003-313 (discussing the legislative history of this statute).
With respect to the subject-matter jurisdiction of a district court to adjudicate an alleged violation of a traffic ordinance, A.C.A. § 16-88-101(4) (Repl. 2005) provides in pertinent part that "[t]he district court shall have original jurisdiction, exclusive of the circuit court, for the trial of violations of ordinances of any town, city, or county within the territorial jurisdiction of the district court. . . ."